IN RE INTEREST OF NERY V. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. MARIO V., SR.,
APPELLANT, IDA V., APPELLEE, AND ROSEBUD
SIOUX TRIBE, INTERVENOR-APPELLEE.

IN RE INTEREST OF ESPERANZA V. AND MARIO V., JR.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. MARIO V., SR.,
APPELLEE, IDA V., APPELLANT, AND ROSEBUD
SIOUX TRIBE, INTERVENOR-APPELLEE.

___ N.W.2d ___

Filed May 28, 2013.    Nos. A-12-629, A-12-662.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.
3. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.
4. **Indian Child Welfare Act: Proof.** Under Nebraska law, a party to a proceeding who seeks to invoke a provision of the Nebraska Indian Child Welfare Act has the burden to show that the act applies in the proceeding.
5. **Indian Child Welfare Act: Time.** To determine whether the Nebraska Indian Child Welfare Act applies, the critical issue is not whether the child is an "Indian child," but, rather, when his or her status was established in the proceedings.
6. **Indian Child Welfare Act: Federal Acts: Time.** The provisions of the federal Indian Child Welfare Act and the Nebraska Indian Child Welfare Act apply prospectively from the date the Indian child's status as such is established on the record.
7. **Indian Child Welfare Act: Parental Rights.** The provisions relating to the withdrawal of a relinquishment provided for in Neb. Rev. Stat. § 43-1506 (Reissue 2008) of the Nebraska Indian Child Welfare Act do not apply to a relinquishment signed prior to the applicability of the act.
8. **Parental Rights: Adoption.** Pursuant to Neb. Rev. Stat. § 43-106.01 (Reissue 2008), the rights of the relinquishing parent are terminated when the Nebraska Department of Health and Human Services, or a licensed child placement agency, accepts responsibility for the child in writing.
9. **Parental Rights: Adoption: Time.** A duly executed revocation of a relinquishment and consent to adoption delivered to a licensed child placement agency within a reasonable time after execution of the relinquishment and before the

agency has, in writing, accepted full responsibility for the child, as required by statute, is effective to invalidate the original relinquishment and consent.

10. **Parental Rights.** There are four requirements for a valid and effective revocation of a relinquishment of parental rights: (1) There must be a duly executed revocation of a relinquishment, (2) the revocation must be delivered to a licensed child placement agency or the Nebraska Department of Health and Human Services, (3) delivery of the revocation must be within a reasonable time after execution of the relinquishment, and (4) delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child.

11. **Parental Rights: Time.** When a parent's attempted revocation of his or her relinquishment of parental rights is not done in a reasonable time after the relinquishment, the relinquishment becomes irrevocable.

12. **Indian Child Welfare Act: Parental Rights: Interventions: Notice.** Pursuant to Neb. Rev. Stat. § 43-1505(1) (Reissue 2008), in any involuntary proceeding in a state court, when the court knows or has reason to know that an Indian child is involved, the party seeking termination of parental rights to an Indian child shall notify the Indian child's tribe, by certified or registered mail with return receipt requested, of the pending proceedings and of the tribe's right of intervention.

13. **Indian Child Welfare Act: Parental Rights: Notice: Time.** Pursuant to Neb. Rev. Stat. § 43-1505(1) (Reissue 2008), no termination of parental rights proceedings shall be held until at least 10 days after receipt of notice by the tribe or the Secretary of the Interior.

14. **Indian Child Welfare Act: Parental Rights: Notice.** If an Indian child's tribe was not given proper notice of proceedings resulting in termination of parental rights to the child, the termination proceedings conducted were invalid and the order of termination must be vacated.

15. **Indian Child Welfare Act: Parental Rights: Pleadings.** The Nebraska Indian Child Welfare Act requires the State, in proceedings to terminate parental rights, to plead (1) active efforts by the State to prevent the breakup of the family and (2) that continued custody by the parent or Indian custodian is likely to result in serious emotional or physical harm.

16. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it.

Appeal from the County Court for Hall County: PHILIP M. MARTIN, JR., Judge. Judgment in No. A-12-629 vacated, and cause remanded for further proceedings. Judgment in No. A-12-662 affirmed in part and in part vacated, and cause remanded for further proceedings.

Matthew C. Boyle, of Lauritsen, Brownell, Brostrom & Stehlik, for Mario V., Sr.

Janice I. Reeves, of Truell, Murray & Associates, for Ida V.

Sarah N. Johnson, Deputy Hall County Attorney, and Jay B. Judds, of Nebraska Department of Health and Human Services, for State of Nebraska.

Susan M. Koenig, guardian ad litem for children.

Sievers, Pirtle, and Riedmann, Judges.

Sievers, Judge.

The county court for Hall County, sitting as a juvenile court, terminated the parental rights of Mario V., Sr. (Mario Sr.), and Ida V. to their minor children. Mario Sr. appeals in case No. A-12-629, and Ida appeals in case No. A-12-662. We initially determine that the relinquishments that Ida executed some 3 years before these proceedings are valid and that her attempted revocation of such is of no force and effect. But, because there is no evidence that the Rosebud Sioux Tribe was given proper notice of these termination of parental rights proceedings as required by the Nebraska Indian Child Welfare Act (NICWA), we find that the termination proceedings conducted were invalid and thus that the order of termination in both cases must be vacated. We therefore remand the causes to the juvenile court for further proceedings consistent with our opinion.

## FACTUAL BACKGROUND

This appeal involves three children: Mario V., Jr. (Mario Jr.), born in November 2004; Esperanza V., born in August 2006; and Nery V., born in October 2008. All three children are the biological children of Mario Sr. and Ida. Mario Sr. and Ida were married on December 23, 2004, and divorced on July 22, 2009. However, Mario Sr. and Ida began living together again in July 2010.

Mario Sr. and Ida have been involved in a number of juvenile court proceedings over the years, and we briefly summarize their encounters with the juvenile system. In October 2004, Ida had rights to another child, her firstborn son, terminated by order of a juvenile court. Mario Sr. was not this child's biological father. Mario Jr. was born less

than 2 months after Ida's parental rights to her firstborn son were terminated.

In October 2005, Mario Jr. was removed from the parental home because Ida tested positive for methamphetamine, violating her probation. Mario Jr. was not placed with Mario Sr. because Mario Sr. then had a pending assault charge wherein Ida was the alleged victim. Mario Jr. was returned to the parental home 6 months later.

In December 2006, Mario Jr. and Esperanza were removed from the parental home because of reports of domestic violence between Mario Sr. and Ida and of drug use by Ida. Ida relinquished her parental rights to Mario Jr. and Esperanza in March 2008, and we note that she was pregnant with Nery at the time. Mario Sr. and Ida separated, and Mario Sr. planned to divorce Ida. Mario Jr. and Esperanza were returned to the custody of Mario Sr. The procedural background of the 2006 juvenile proceedings, case No. JV06-470, will be further discussed below.

Although Mario Sr. and Ida had divorced in July 2009, they began living together again in July 2010. Because Mario Sr. worked out of town and was only home on the weekends, Ida was the primary caregiver for Mario Jr., Esperanza, and Nery.

In November 2010, Mario Jr., Esperanza, and Nery were removed from the parental home after a 1-month investigation by the Nebraska Department of Health and Human Services (DHHS). DHHS was concerned about Ida's being the primary caregiver because of her previous relinquishments of Mario Jr. and Esperanza. DHHS was also concerned because Ida admitted feeling overwhelmed, Ida had made statements about wanting Mario Jr. and Esperanza back in foster care, and Ida admitted the urge to use drugs again. Additionally, Ida's brother, who had an extensive criminal history, had been living in the family home. Around the time of this removal, Esperanza and Nery tested positive for exposure to methamphetamine. The November 2010 removal gave rise to juvenile case No. JV10-505, wherein Mario Sr.'s and Ida's parental rights were terminated. The procedural background of cases Nos. JV06-470 and JV10-505 will be discussed below.

## PROCEDURAL BACKGROUND

To put all of the procedural background together in "one place," before attempting a narrative account of the procedure, we set forth the following timeline of significant dates and events, with the hope that such allows the reader to follow the progression of the cases more easily, and we note the lower court case number for clarity:

- 03/13/2008 Ida signed her relinquishments of her parental rights to Mario Jr. and Esperanza (JV06-470).
- 11/01/2010 The State filed its petition alleging that Mario Jr., Esperanza, and Nery were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008); temporary custody was granted to DHHS (JV10-505).
- 12/03/2010 NICWA notice was sent to the Rosebud Sioux Tribe regarding the State's § 43-247(3)(a) petition and the order for immediate custody (JV10-505).
- 12/07/2010 The return receipt for the NICWA notice was signed (JV10-505).
- 12/08/2010 The State filed its petition for termination of Mario Sr.'s and Ida's parental rights to Mario Jr., Esperanza, and Nery pursuant to Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012) (JV10-505).
- 02/04/2011 The Rosebud Sioux Tribe filed its "Notice of Intervention" invoking its right to intervene in the child custody proceedings and noting that all three children were "enrollable" members of the tribe (JV10-505).
- 07/22/2011 Ida filed notice of her intent to withdraw her voluntary relinquishment of her parental rights (JV06-470).
- 08/16/2011 Ida filed her withdrawal of her voluntary relinquishment of her parental rights (JV06-470); she also filed motions to dismiss the State's motion for termination, alleging the State failed to provide proper notice to the tribe and failed to state a proper cause of action (JV10-505).
- 08/22/2011 The juvenile court took Ida's withdrawal of her relinquishments (JV06-470) and her pretrial motions to dismiss (JV10-505) under advisement and proceeded with the first day of the termination proceedings (JV10-505).
- 08/23/2011 Second day of the termination proceedings (JV10-505).

- 09/06/2011 Third day of the termination proceedings (JV10-505).
- 09/13/2011 Fourth day of the termination proceedings; the State filed an amended petition for termination of Mario Sr.'s and Ida's parental rights, adding an allegation of "active efforts" (JV10-505).
- 10/21/2011 The State filed another amended petition for termination of Mario Sr.'s and Ida's parental rights, adding an allegation of "serious emotional or physical damage" if such rights are not terminated (JV10-505).
- 11/22/2011 Fifth day of the termination proceedings (JV10-505).
- 01/31/2012 Sixth and final day of the termination proceedings (JV10-505).
- 06/25/2012 The juvenile court filed an order wherein it denied Ida's request to withdraw her relinquishments of Mario Jr. and Esperanza (JV06-470 and JV10-505), overruled Ida's motions to dismiss for improper notice to the tribe and failure to state a proper cause of action (JV10-505), terminated Ida's parental rights to Nery (JV10-505), and terminated Mario Sr.'s parental rights to all three children (JV10-505).

*Case No. JV06-470.*

The State filed a petition on December 18, 2006, alleging that Mario Jr. and Esperanza were within the meaning of § 43-247(3)(a) by reason of the faults or habits of their "parent, guardian, or custodian." At the bottom of the petition, under "Name & Address of Parent/Custodian," it listed Mario Sr. and Ida at different addresses in Grand Island, Nebraska. The State alleged that on December 11, the children (1) lacked "proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" and (2) were "in a situation or engage[d] in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile[s]."

A disposition and permanency hearing as to Ida only was held on February 15, 2007 (the proceedings of which do not appear in our record). We do have an order titled "Disposition/Permanency Hearing," written in checklist form, that states that continued placement of the children in a parental residence

is not appropriate because "rehabilitation goals [are] not complete" and "father" is allegedly residing with "mother." Thus, the children were placed in the care and custody of DHHS. The case and visitation plan dated February 12, 2007, was approved. The disposition regarding Mario Sr. was set for March 19.

On January 10, 2008, the State filed a motion for termination of Mario Sr.'s and Ida's parental rights to Mario Jr. and Esperanza pursuant to § 43-292(1), (4), and (6). The State alleged that the parents had abandoned the juveniles for 6 months or more immediately prior to the filing of the petition; that "[t]he parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile[s]"; and that reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication.

Ida voluntarily relinquished her parental rights to Mario Jr. and Esperanza on March 13, 2008. Her signed relinquishments were not filed with the juvenile court, but are in our record. In an order filed on June 17, 2009, the court dismissed the allegations against Mario Sr. and dismissed the case.

On July 22, 2011, Ida filed notice, in case No. JV06-470, of her intent to withdraw her voluntary relinquishment of her parental rights to Mario Jr. and Esperanza, even though that case had been dismissed in 2009. And on August 16, 2011, Ida filed her withdrawal of her voluntary relinquishment of her parental rights. A hearing on Ida's request to withdraw her relinquishments was held on August 22. In an order filed that same day, the court took Ida's withdrawal of her relinquishments under advisement. We note that case No. JV10-505 was ongoing at the time Ida filed her withdrawal of her relinquishments. And the proceedings on August 22 were held in conjunction with those of case No. JV10-505. In an order filed on June 25, 2012, in both cases Nos. JV06-470 and JV10-505, the juvenile court denied Ida's request to withdraw the relinquishment of her parental rights.

*Case No. JV10-505.*

The State filed a petition on November 1, 2010, alleging that Mario Jr., Esperanza, and Nery were within the meaning of § 43-247(3)(a) by reason of the faults or habits of their "parent, guardian, or custodian." At the bottom of the petition, under "Name & Address of Parent/Custodian," it listed Mario Sr. and Ida both at the same address in Grand Island. The State alleged that on October 26, the children (1) lacked "proper parental care by reason of the fault or habits of [their] parent, guardian, or custodian" and (2) were "in a situation or engage[d] in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile[s]." Also on November 1, the juvenile court filed an ex parte custody order finding, "[Mario Sr.] is not providing care—delegated to [Ida] who previously relinquished her rights to older two children. She is unable to provide care for children due to mental health and/or drug issues." The juvenile court granted temporary custody and placement of the children to DHHS.

An "Initial/Detention" hearing was held on December 2, 2010 (no transcription of this hearing appears in our record), and the order resulting from such hearing recites that Mario Sr. and Ida were present with their respective counsel. The court's order, entitled "Initial/Detention Hearing" and written in checklist form, has a checkmark by "Parent(s) deny allegations," followed by a handwritten notation that is not legible. The juvenile court again granted temporary custody and placement of the children to DHHS. The preadjudication hearing was set for January 3, 2011, and the adjudication hearing was set for March 3. The order indicates that the proceedings for Ida were with respect to Nery only.

A NICWA notice was sent to the Rosebud Sioux Tribe on December 3, 2010, regarding the State's § 43-247(3)(a) petition and the juvenile court's order for immediate custody. A return receipt was signed on December 7.

On December 8, 2010, the State filed a motion for termination of Mario Sr.'s and Ida's parental rights to Mario Jr., Esperanza, and Nery pursuant to § 43-292(2). The State alleged that the parents had "substantially and continuously or repeatedly neglected and refused to give the juvenile[s] or a

sibling of the juvenile[s] necessary parental care and protection." We note that the State's motion seeks to terminate Ida's parental rights to all three children but does not account for the fact that Ida had already relinquished her parental rights to Mario Jr. and Esperanza, and we note that the State's amended termination motions were pled this way as well.

In a "Notice of Intervention" dated January 31, 2011, but not filed until February 4, the Rosebud Sioux Tribe "invoke[d]" its right to intervene in the child custody proceedings, noting that all three children were "enrollable" members of the tribe. The juvenile court "grant[ed]" the Rosebud Sioux Tribe's notice of intervention. The juvenile court ordered:

[C]opies of all future motions and pleadings are to be served upon the Rosebud Sioux Tribe as a party herein. Opportunity to examine all relevant documents filed with the Court upon which a decision may be based must be afforded to the Rosebud Sioux Tribe's authorized representatives pursuant to 25 U.S.C., Section 1912(c).

On August 16, 2011, Ida filed a motion to dismiss the State's motion to terminate parental rights, alleging that the State failed to provide proper notice to the Indian children's tribe. In a separate motion to dismiss filed that same day, Ida alleged that the State failed to state a proper cause of action in that it failed to allege an essential element of NICWA (that active efforts have been made to prevent the breakup of the Indian family, but that such have proved unsuccessful) to sustain a finding and order for termination. Ida also filed a motion to have the children immediately returned to the parental home, alleging that removal of the Indian children was not proper because the applicable statute required clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. A hearing on Ida's motions was held on August 22. In an order titled "Motion," file stamped on both August 22 and November 22, the court stated that all three motions were "under advisement." The court proceeded with the termination hearing on August 22.

The termination proceedings were spread over a substantial period of time, as hearings were held on August 22 and 23, September 6 and 13, and November 22, 2011, and January 31, 2012. Pleadings were filed during the course of the termination proceedings, as will be noted below. No representative of the Rosebud Sioux Tribe was in attendance at any of these hearings.

On September 13, 2011, the fourth day of the termination proceedings, the State filed an amended motion for termination of Mario Sr.'s and Ida's parental rights to Mario Jr., Esperanza, and Nery. In addition to alleging grounds for termination under § 43-292(2), the State alleged that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and that these efforts have been unsuccessful." See Neb. Rev. Stat. § 43-1505(4) (Reissue 2008) (of NICWA).

On October 21, 2011, the State again filed an amended motion for termination of Mario Sr.'s and Ida's parental rights to Mario Jr., Esperanza, and Nery. In addition to alleging grounds for termination under § 43-292(2) and "active efforts" under § 43-1505(4), the State alleged that continued custody by the parents is likely to result in serious emotional or physical damage to the children. See § 43-1505(6) (of NICWA). The final 2 days of the termination proceedings were held after this amended motion was filed.

On November 22, 2011, Mario Sr. filed a motion for posttermination visitation with all three children during appeal, in the event the court entered an order terminating Mario Sr.'s parental rights. Ida filed a similar motion regarding Nery on April 19, 2012. The motions were considered and ruled on prior to the juvenile court's determination of whether parental rights should in fact be terminated. In an order filed on June 1, the juvenile court overruled Mario Sr.'s and Ida's motions for posttermination visitation. The juvenile court stated that "[v]isitation, if any, provided after an order of termination of parental rights in this case would be in the sole discretion of [DHHS]."

The juvenile court filed its dispositive order on June 25, 2012. The juvenile court stated, "The Court, at this time, has

contemporaneously entered an order in [case No.] JV06-470 denying the request of Ida . . . to withdraw her relinquishments of her parental rights" to Mario Jr. and Esperanza dated March 13, 2008. Thus, the juvenile court proceeded to consider the motion to terminate the parental rights of Mario Sr. to all three children and the parental rights of Ida to Nery, first dealing with several pretrial motions from August 2011.

Regarding Ida's August 2011 motion to dismiss for insufficient notice to the Indian children's tribe, the juvenile court found that the tribe did receive notice and, in fact, intervened in the case, but apparently chose not to participate. Accordingly, the juvenile court overruled Ida's motion to dismiss for insufficient notice.

Regarding Ida's August 2011 motion to dismiss for insufficient pleadings—asserting that the State failed to state a proper cause of action in that it failed to articulate an essential element, i.e., "active efforts" in accordance with § 43-1505(4)— the juvenile court stated, "It is acknowledged that the pleadings at the time they were initially filed were legally insufficient based on later developments and knowledge obtained concerning the enrollment of the children in the Rosebud Sioux Tribe." However, the court found that once it was determined that the children were entitled to enrollment, the State filed an amended petition which cured any defects in the prior pleading. The juvenile court stated that the matter would proceed under the requirements of NICWA and overruled Ida's motion to dismiss based on improper pleadings.

The juvenile court found that grounds for termination of Mario Sr.'s rights to Mario Jr., Esperanza, and Nery existed under § 43-292(2). The juvenile court found that grounds existed to terminate Ida's rights to Nery under § 43-292(2). The juvenile court found that active efforts, pursuant to § 43-1505(4), had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, but that said efforts had proved unsuccessful. The juvenile court also found that continuing the custody of the children by Mario Sr. and Ida would likely result in serious emotional or physical damage to the children and that it was in the children's best interests that Mario Sr.'s and Ida's

parental rights be terminated. The juvenile court terminated Mario Sr.'s parental rights to all three children and Ida's parental rights to Nery after finding that grounds for termination existed and that such was in the children's best interests. Mario Sr. appeals in case No. A-12-629, and Ida appeals in case No. A-12-662.

## ASSIGNMENTS OF ERROR

In case No. A-12-629, Mario Sr. assigns that the juvenile court erred by (1) failing to rule on pretrial motions for over 10 months, (2) allowing the State to file and proceed on a second amended motion to terminate parental rights, (3) proceeding with the termination proceedings when insufficient notice was provided to the Indian tribe, (4) failing to properly apply the rules of evidence to an adjudicative hearing and improperly admitting evidence prejudicial to Mario Sr., (5) finding that the State satisfied its burden to prove all statutorily required elements for terminating parental rights under NICWA, (6) denying Mario Sr.'s request for posttermination visitation, and (7) allowing and considering evidence regarding the foster parents' desire and ability to provide permanency for the children.

In case No. A-12-662, Ida assigns that the juvenile court erred by (1) denying Ida's withdrawal of her relinquishment of her parental rights to Mario Jr. and Esperanza, (2) failing to rule on pretrial motions for over 10 months, (3) allowing the State to file and proceed on a second amended motion to terminate parental rights, (4) proceeding with the termination proceedings when insufficient notice was provided to the Indian tribe, (5) proceeding with the termination proceedings when insufficient notice was provided to Ida, (6) finding that the State satisfied its burden to prove all statutorily required elements for terminating parental rights under NICWA, (7) denying Ida's request for posttermination visitation, (8) allowing and considering evidence regarding the foster parents' desire and ability to provide permanency for the children, and (9) failing to properly apply the rules of evidence to an adjudicative hearing and improperly admitting evidence prejudicial to Ida.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

[3] To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *Id.*

## ANALYSIS

*Ida's Withdrawal of Her Relinquishments
of Her Parental Rights to Mario Jr.
and Esperanza.*

On March 13, 2008, during the pendency of case No. JV06-470, Ida signed separate "Relinquishment of Child by Parent" documents for both Mario Jr. and Esperanza wherein Ida voluntarily relinquished her parental rights to Mario Jr. and Esperanza. Neither the relinquishment documents nor an acceptance by DHHS was filed with the court, although the relinquishments are part of the evidence before us. In an order filed on June 17, 2009, the court dismissed the allegations against Mario Sr. and dismissed that case.

More than 3 years after she signed the relinquishments, and more than 2 years after case No. JV06-470 was dismissed, Ida sought to withdraw her voluntary relinquishments of her parental rights to Mario Jr. and Esperanza. On July 22, 2011, while case No. JV10-505 was ongoing, Ida filed her notice of her intent to withdraw her voluntary relinquishments of her parental rights to Mario Jr. and Esperanza in case No. JV06-470. And on August 16, Ida filed her withdrawal of her voluntary relinquishments of her parental rights. In an order dated August 22, 2011, the court took Ida's attempted revocation of her relinquishments under advisement. In an order filed on June 25, 2012, the juvenile court denied Ida's request to withdraw the relinquishments of her parental rights.

Ida argues that the juvenile court erred in denying her request to withdraw her relinquishments of her parental rights. In support of her argument, Ida cites to the following NICWA provisions found in Neb. Rev. Stat. § 43-1506 (Reissue 2008):

> (1) When any parent or Indian custodian voluntarily consents to . . . termination of parental rights, such consent shall not be valid unless executed in writing and recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian. The court shall also certify that either the parent or Indian custodian fully understood the explanation in English or that it was interpreted into a language that the parent or Indian custodian understood. . . .
>
>      . . . .
>
> (3) In any voluntary proceedings for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent.

Ida argues that the right to withdraw her relinquishments of Mario Jr. and Esperanza found in § 43-1506(3) was erroneously denied.

[4-7] "Under Nebraska law, a party to a proceeding who seeks to invoke a provision of NICWA has the burden to show that the act applies in the proceeding." *In re Adoption of Kenten H.*, 272 Neb. 846, 853, 725 N.W.2d 548, 554 (2007). And the critical issue is not whether the child is an "Indian child," but, rather, when his or her status was established in the proceedings. See *id*. The provisions of the federal Indian Child Welfare Act and NICWA apply prospectively from the date the Indian child's status as such is established on the record. See *id*. In the instant case, the children's status as Indian children was established on the record when the Rosebud Sioux Tribe filed its "Notice of Intervention"

on February 4, 2011, stating that Mario Jr., Esperanza, and Nery were "enrollable" members of the tribe. Thus, NICWA applies prospectively from that date. Accordingly, NICWA was not applicable to Mario Jr. and Esperanza when Ida signed her relinquishments of her parental rights to Mario Jr. and Esperanza on March 13, 2008. And as stated in *In re Adoption of Kenten H.*, "[b]ecause NICWA applies only prospectively from the date it is established on the record, [the biological mother] may not now argue that her consent to [the child's] relinquishment is invalid because it was not obtained pursuant to the substantive provisions of § 43-1506(1)." 272 Neb. at 855, 725 N.W.2d at 555. And we now conclude that it necessarily follows from the holding in *In re Adoption of Kenten H., supra*, that the provisions relating to the withdrawal of a relinquishment provided for in § 43-1506 do not apply to a relinquishment signed prior to the applicability of NICWA, which is the situation we have here.

But Ida argues that even if NICWA did not apply at the time the relinquishments were signed, there was no acceptance of the relinquishment by DHHS. Ida's signed relinquishments were not filed with the court in case No. JV06-470; nor was any acceptance filed by DHHS. The only mention of either the relinquishments or their acceptance in the transcript in case No. JV06-470 is Ida's prior counsel's "Motion to Be Excused" filed on March 25, 2008, wherein counsel asked to be excused from an April 7 hearing because "biological mother, Ida . . . has relinquished her parental rights, and [DHHS] has accepted the relinquishment." The juvenile court granted counsel's motion to be excused from that hearing. While the State suggested at oral argument that we use the contents of this withdrawal motion as evidence of DHHS' acceptance, the document is not in evidence, is not under oath, and is obviously hearsay. Accordingly, we reject that suggestion, although it is not insignificant for the policy reasons we later discuss that DHHS and the court acted for several years as though there was an acceptance. It was not until August 23, 2011, the second day of the termination proceedings in case No. JV10-505, that the relinquishments were offered and received into evidence by the court. However, no written

acceptances of such by DHHS were ever offered or received into evidence. And, there was no testimony that DHHS signed any such acceptances.

[8] The rights of the relinquishing parent are terminated when DHHS, or a licensed child placement agency, accepts responsibility for the child in writing. See, Neb. Rev. Stat. § 43-106.01 (Reissue 2008); *Gomez v. Savage*, 254 Neb. 836, 580 N.W.2d 523 (1998). Section 43-106.01 states in relevant part:

> When a child shall have been relinquished by written instrument . . . to [DHHS] or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child.

See, also, *In re Interest of Cornelius K.*, 280 Neb. 291, 785 N.W.2d 849 (2010) (fact that relinquishment has not been accepted by DHHS means that mother's parental rights have not been legally extinguished pursuant to § 43-106.01); *In re Interest of Gabriela H.*, 280 Neb. 284, 785 N.W.2d 843 (2010) (juvenile court may order DHHS to accept relinquishment of parental rights in circumstance where child has been adjudicated pursuant to § 43-247(3)(a) and permanency objective of adoption has been determined). Therefore, it is clear that § 43-106.01 applies to DHHS as well as private child placement agencies. In the instant case, there is no evidence of a written acceptance by DHHS of Ida's relinquishments of Mario Jr. and Esperanza. We cannot simply assume that DHHS executed written acceptances of Ida's relinquishments and that they are tucked away in a file cabinet somewhere. That said, there is no authority involving a factual situation where there was an attempted revocation 3 years after the relinquishments, and the record fails to show whether DHHS ever accepted the relinquishments. Accordingly, we face a unique situation and a difficult issue of first impression.

That said, we know of no statute or case law authority that would prevent the execution of acceptance at the present time. The foregoing observation stems from *Kellie v. Lutheran*

*Family & Social Service*, 208 Neb. 767, 772, 305 N.W.2d 874, 877 (1981), which established that the revocation of a relinquishment of parental rights must occur within a "reasonable time" after the relinquishment.

In *Kellie, supra*, the mother sought to revoke her relinquishment prior to the agency's written acceptance of relinquishment. On November 18, 1978, the mother signed a relinquishment and consent to adoption regarding her 5-year-old daughter, and the child was delivered to a licensed child placement agency and later placed with a prospective adoptive family. Three days after signing the relinquishment, the mother contacted her social worker and told him that she had made a mistake and wanted her daughter back. The social worker advised the mother that she could not get her daughter back. The mother called the social worker again on Thanksgiving Day and went to his office twice thereafter trying to obtain her daughter's return. On December 26, the mother telephoned the prospective adoptive parents asking them to voluntarily return her daughter, but they refused. On December 27, the mother personally delivered a written and notarized revocation of relinquishment to the child placement agency. On January 2, 1979, both natural parents of the child filed suit to regain custody of their daughter. The acceptance of the relinquishment was not signed by the child placement agency until January 12, 1979, approximately 2 weeks after the relinquishment had been revoked by the mother and more than a week after the parents' court action had been commenced. The district court denied the natural parents' petition for a writ of habeas corpus.

[9,10] On appeal, the Nebraska Supreme Court stated that § 43-106.01 was the critical section of the Nebraska adoption statutes. The child placement agency took the position that the statutory requirement of written acceptance is only a technical requirement and that it accepted in fact when it accepted the child at the time the relinquishment was signed. The Supreme Court said:

> Courts have traditionally required substantial if not strict compliance with all statutory requirements with respect to the formalities of execution of a parent's

consent to adoption or relinquishment of parental rights. A consent or relinquishment which fails to meet statutory requirements cannot be given legal effect. See 2 Am. Jur. *Adoption* § 43 (1962). In this state we have followed the rule that strict compliance with the adoption statutes is required. . . .

This court has noted that a licensed child placement agency is required to accept responsibility for the child, in writing, under § 43-106.01. See *Kane v. United Catholic Social Services*, 187 Neb. 467, 191 N.W.2d 824 (1971).

The respondent contends that to require strict compliance with the statute will place an undue burden upon a licensed child placement agency and create uncertainty during the time period between execution of a relinquishment and its acceptance. We disagree. Arrangements for prompt and strict compliance with the statute can obviously be made by proper administrative procedures.

A duly executed revocation of a relinquishment and consent to adoption delivered to a licensed child placement agency *within a reasonable time* after execution of the relinquishment and before the agency has, in writing, accepted full responsibility for the child, as required by statute, is effective to invalidate the original relinquishment and consent. Basic principles of offer and acceptance, as well as the statute, dictate that result. In the present case [the mother] attempted to revoke within 3 days after execution of the relinquishment, continued her efforts repeatedly, and delivered the duly executed revocation less than 6 weeks after the original relinquishment was signed. Under the circumstances here [the revocation of relinquishment] was within a reasonable time.

*Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 771-72, 305 N.W.2d 874, 876-77 (1981) (emphasis supplied). Justice White in his concurrence asserted that the majority opinion injected by judicial action "a separate 'reasonable time' requirement for revocation." *Id*. at 774, 305 N.W.2d at 878 (White, J., concurring; Krivosha, C.J., and Clinton, J., join). Nonetheless, in our view, the majority opinion in *Kellie*

actually imposes four requirements for a valid and effective revocation of a relinquishment: (1) There must be a duly executed revocation of a relinquishment, (2) the revocation must be delivered to the licensed child placement agency (or DHHS), (3) delivery of the revocation must be within a reasonable time after execution of the relinquishment, and (4) delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child.

We focus on the third requirement of the four prerequisites for a valid revocation of a relinquishment of parental rights which under *Kellie*, *supra*, is simply that the revocation must be done within a reasonable time of the relinquishment. We hold that 3 years between relinquishment and the attempted revocation is simply, as a matter of law, an unreasonable time. To hold otherwise would result in relinquished children being suspended in "legal limbo" while a parent took years to decide whether they really meant what they said in the relinquishment document. And, to hold otherwise would clearly place undue hardship on adoption and placement agencies, to say nothing about what it would mean for people willing to adopt these children. Accordingly, we hold as a matter of law that Ida's attempted revocation of the relinquishments of Mario Jr. and Esperanza 3 years after the fact does not and cannot satisfy the requirement that a revocation be delivered in a "reasonable time" after the relinquishment. And therefore, the third of the four conditions for a valid revocation of Ida's relinquishment cannot ever be satisfied.

The timeframe for revocation in the instant case is clearly vastly different from that in *Kellie, supra*. In *Kellie*, the mother attempted to regain her child within 3 days after executing the relinquishment of her parental rights, continued her efforts repeatedly, and delivered a duly executed revocation less than 6 weeks after the relinquishment was signed.

[11] However, we are not done with the requirements laid down in *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981), which we take as separate and distinct in the sense that the failure to satisfy one of the requirements means that an attempted revocation of a relinquishment is invalid and fails. In the course of the

proceedings here, the State's counsel represented that there had been acceptance in writing by DHHS, but such was never put in evidence by the State, as it obviously should have been—if it existed. We cannot know, nor can we assume, that such written acceptance exists. But, when we bear in mind the *Kellie* court's rubric that a relinquishment is essentially a matter of contract, i.e., offer and acceptance, we conclude that because Ida's attempted revocation was not as a matter of law done in a reasonable time after the relinquishment, the relinquishment has become irrevocable for the policy reasons outlined above. Thus, if such has not already been accepted, it can still be accepted. For the policy reasons we have articulated, we are, in effect, saying that in the circumstances before us, the requirement that a revocation of relinquishment must be done in a reasonable time trumps the requirement that DHHS must accept the relinquishment before there is a valid relinquishment. Upon the remand that we outline below, the trial court should direct DHHS to accept the relinquishments, if it has not previously done so. See *In re Interest of Gabriela H.*, 280 Neb. 284, 785 N.W.2d 843 (2010). Thus, we reject Ida's assignment of error that the juvenile court erred in not giving effect to her attempted revocation of her relinquishment of Mario Jr. and Esperanza.

*Notice to Tribe.*

[12,13] Mario Sr. and Ida argue that the juvenile court erred in proceeding with the termination proceedings when insufficient notice was provided to the Rosebud Sioux Tribe. Section 43-1505(1) states:

> In any involuntary proceeding in a state court, when the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights to[] an Indian child shall notify . . . the Indian child's tribe, by certified or registered mail with return receipt requested, of the pending proceedings and of [the tribe's] right of intervention. . . . No . . . termination of parental rights proceedings shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the [S]ecretary [of the Interior].

There is no evidence that the Rosebud Sioux Tribe was ever given notice of the termination of parental rights proceedings as required by § 43-1505(1). The record shows that notice was given to the tribe only with respect to the adjudication proceedings.

The State filed a petition on November 1, 2010, alleging that Mario Jr., Esperanza, and Nery were within the meaning of § 43-247(3)(a) by reason of the faults or habits of their "parent, guardian, or custodian." That same day, the juvenile court entered an ex parte custody order granting temporary custody and placement of the children to DHHS. A NICWA notice was sent to the Rosebud Sioux Tribe on December 3 regarding the State's § 43-247(3)(a) petition and the juvenile court's order for immediate custody. A return receipt was signed on December 7. This was the only NICWA notice, via certified mail or otherwise, that the Rosebud Sioux Tribe received, insofar as the record before us reveals.

The State filed its motion to terminate Mario Sr.'s and Ida's parental rights on December 8, 2010. The termination proceedings included hearings held on August 22 and 23, plus September 6 and 13, 2011. Also on September 13, the State filed its first amended motion—adding an allegation that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and that these efforts have been unsuccessful," a required NICWA element pursuant to § 43-1505(4). The State filed its second amended motion on October 21, adding language that "[c]ontinued custody by the parents is likely to result in serious emotional or physical damage to the children," a required NICWA element pursuant to § 43-1505(6). The shortcomings in the pleadings, and subsequent remedial steps to correct such, are before us via assignments of error from both Mario Sr. and Ida. We note the obvious fact that only the October 21 amended motion contains the proper pleadings for a NICWA case involving potential termination of parental rights. The termination hearings proceeded on November 22, 2011, and January 31, 2012, both of which occurred after the State's pleadings were corrected to allege that the NICWA requirements had been satisfied. In the end,

we find that we need not address the assignments of error aimed at the pleading issues in order to resolve the appeal. See *In re Trust Created by Hansen*, 281 Neb. 693, 798 N.W.2d 398 (2011) (appellate court is not obligated to engage in analysis that is not needed to adjudicate controversy before it).

There is no evidence that the Rosebud Sioux Tribe was properly notified of the original motion to terminate parental rights, filed on December 8, 2010, which came after the tribe was given NICWA notice only of the § 43-247(3)(a) adjudication petition but before the tribe filed its "Notice of Intervention." Since the tribe filed its notice of intervention in February 2011, the termination motion has been amended twice to conform to the elements necessary for a termination under NICWA, yet there is no showing in the record that the tribe was given notice of these amended pleadings. And as stated previously in our opinion, the juvenile court ordered:

> [C]opies of all future motions and pleadings are to be served upon the Rosebud Sioux Tribe as a party herein. Opportunity to examine all relevant documents filed with the Court upon which a decision may be based must be afforded to the Rosebud Sioux Tribe's authorized representatives pursuant to 25 U.S.C., Section 1912(c).

Even though the original termination motion was not a "future" motion or pleading, the Rosebud Sioux Tribe should have been notified, by "certified or registered mail with return receipt requested, of the pending proceedings" in order to comply with § 43-1505(1). But there is no evidence in our record that the tribe was notified of the original motion to terminate parental rights, as required by § 43-1505(1).

[14] At the time the termination proceedings began, the original motion for termination of parental rights was the operative motion and the tribe had not been provided notice of such proceedings as required by § 43-1505(1). In *In re Interest of Walter W.*, 14 Neb. App. 891, 900-901, 719 N.W.2d 304, 311-12 (2006), we said:

> [T]he [tribe's] representative . . . stated that the tribe intervened because it wanted to be informed of the progress of the case, and the tribe did not waive notice

of future proceedings in this case. Since the plain language of the statute provides that "[n]o . . . termination of parental rights proceedings shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the secretary," [§ 43-1505(1)], we determine that the termination hearing conducted in this case was invalid, and thus, the order of termination must be vacated. We therefore remand this cause to the juvenile court for further proceedings to be conducted following provision of proper notice to the Yankton Sioux Tribe.

Similarly, because the Rosebud Sioux Tribe was not given proper notice, the termination proceedings conducted in the instant case were invalid, and thus, the order of termination must be vacated. We therefore remand the causes to the juvenile court for further proceedings to be conducted following provision of proper notice to the Rosebud Sioux Tribe.

Moreover, there were numerous notification failures by the State. Despite the court's order that "copies of all future motions and pleadings are to be served upon the Rosebud Sioux Tribe as a party herein," the amended motions filed on September 13 and October 21, 2011, do not contain a certificate of service showing to which parties, if any, the pleadings were sent or any indication that they were sent, whether it was via regular mail or certified mail with return receipt requested. The amended motions simply contain the following notation, which we quote, following the signature of State's counsel: "cc: Consulate of Mexico[,] Ogallala Sioux Tribe." Thus, to the extent that such is considered service, it is service on the wrong tribe. And therefore, we must conclude that notice was not provided to the Rosebud Sioux Tribe of the amended motions to terminate parental rights, which were filed midtrial.

The State argues that after the Rosebud Sioux Tribe filed its notice of intervention, the court sent notices to the tribe of all further hearing dates, but the record does not verify that assertion.

The State also argues that notice of the second amended motion to terminate was sent to the Rosebud Sioux Tribe by

registered mail more than 10 days prior to the next hearing date on the motion, January 31, 2012. Exhibit 29 is a signed return receipt stamped with a date of January 9, 2011, for an "Article Addressed to: Rosebud Sioux Tribe[,] Attn: Shirley J. Bad Wound." At the termination hearing held on January 31, 2012, the State offered the return receipt into evidence and counsel said, "[F]or some reason it has a stamp on it that says January 29th, which is when they got it, but it says 2011, so apparently they didn't turn — somebody forgot the year or something." The State "concedes that notice by registered mail on the second Amended Motion to Terminate was accomplished late. . . . The notice was still sent by registered mail ten days prior to the next hearing date on the motion, January 31, 2012." Briefs for appellee State in cases Nos. A-12-629 and A-12-662 at 19. Thus, the State concedes that the date stamp on exhibit 29 has the wrong year, which should actually be 2012, not 2011.

That said, there is still no proof of what was sent to the Rosebud Sioux Tribe on January 9, 2012. Exhibit 29 is merely evidence that the State sent "something" to the Rosebud Sioux Tribe prior to the last day of the termination proceedings held on January 31, but there is no evidence as to what was sent. While the State refers to exhibit 29 as the notice of the amended motion, there is no evidence in the record that such statement is correct. Exhibit 29 is only a return receipt from the Rosebud Sioux Tribe, and there is no indication as to what was actually sent to and received by the tribe. While it could have been the amended termination motion, "could have" does not satisfy the State's burden to prove proper notice to the tribe under NICWA. Furthermore, § 43-1505(1) states that "[n]o . . . termination of parental rights proceedings shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the secretary." The termination proceedings began on August 22, 2011. Thus, the State's argument that late notice was "harmless error" because the amended motion was sent "ten days prior to the next hearing date on the motion, January 31, 2012," is without merit and contrary to law, given that a number of hearings on the termination of parental rights had already

occurred. See briefs for appellee State in cases Nos. A-12-629 and A-12-662 at 19.

*Were Pleadings Sufficient for*
*Purposes of NICWA?*

Although the failure to give proper notice to the Rosebud Sioux Tribe means that the termination decision of the trial court in each case must be vacated, and the causes remanded, there are assignments of error dealing with the adequacy of the pleadings that we briefly address. In a NICWA case, there are strict pleading requirements to which prosecutors and courts must adhere. On December 8, 2010, the State filed its motion to terminate Mario Sr.'s and Ida's parental rights to Mario Jr., Esperanza, and Nery pursuant to § 43-292(2), but this termination motion did not include any allegations under NICWA. And this was the operative motion when the termination proceedings began on August 22, 2011, and continued on the next day and then proceeded on September 6 and 13. But on September 13, the State filed its first amended motion that alleged grounds for termination under § 43-292(2) and alleged that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and that these efforts have been unsuccessful"—a required NICWA element pursuant to § 43-1505(4). But the State did not include all required NICWA elements in its termination motion until October 21, when it alleged that "[c]ontinued custody by the parents is likely to result in serious emotional or physical damage to the children." This is a necessary NICWA element under § 43-1505(6) that is part of the State's burden of proof.

Argument on Ida's pretrial motion going to the pleading deficiency was heard on August 22, 2011, prior to the court's proceeding with the termination hearing, and Mario Sr. joined in Ida's motion at that time. The court inexplicably did not resolve these well-taken motions prior to proceeding with the termination hearing.

[15] In *In re Interest of Sabrienia B.*, 9 Neb. App. 888, 621 N.W.2d 836 (2001), we held that NICWA requires the State to plead (1) active efforts by the State to prevent the breakup

of the family and (2) that continued custody by the parent or Indian custodian is likely to result in serious emotional or physical harm. We found the State's failure to include the applicable NICWA elements in its motion was not remedied by the facts that the applicability of NICWA had been discussed in court and that the juvenile court specifically found that the State had proved the relevant NICWA requirements. Accordingly, we found that the demurrer filed by the mother should have been granted. However, we found that the State could, by amendment, cure the defects of the motion for termination of parental rights and that the State must be given the opportunity to amend. We therefore vacate, and remand for further proceedings.

[16] In these cases, there was no reason we can discern why the State could not have amended its motion to terminate parental rights to comply with NICWA prior to the commencement of the termination hearing on August 22, 2011. The children's status as Indian children was established by the Rosebud Sioux Tribe's "Notice of Intervention" filed on February 4 of that year. Given our holding in *In re Interest of Sabrienia B., supra*, amendment of the State's motion would be appropriate. We can envision no reason to delay ruling on a motion raising the adequacy of the allegations under NICWA, but given the other issues which are dispositive of this appeal, we need not go any further with this pleading issue, other than to emphasize the importance of proper pleading in a NICWA case. And we take this approach and do not discuss the other assignments of error that are not necessary to dispose of these appeals. See *In re Trust Created by Hansen*, 281 Neb. 693, 798 N.W.2d 398 (2011) (appellate court is not obligated to engage in analysis that is not needed to adjudicate controversy before it).

## CONCLUSION

For the reasons stated above, in case No. A-12-662, we find that Ida's relinquishments of her parental rights to Mario Jr. and Esperanza are valid and effective. Accordingly, we affirm the juvenile court's decision to deny Ida's request to revoke such relinquishments. However, because there is no evidence

that the Rosebud Sioux Tribe was given proper notice of the termination of parental rights proceedings as required by § 43-1505(1) of NICWA, we find that the termination proceedings conducted in the instant cases were invalid, and thus, the orders of termination must be vacated. We therefore remand the cause in each case to the juvenile court for further proceedings to be conducted following provision of proper notice to the Rosebud Sioux Tribe. Such further proceedings are limited to Nery in case No. A-12-662, because Ida's relinquishments as to Mario Jr. and Esperanza mean that her parental rights as to those two children are already finally terminated. In case No. A-12-629, we vacate the order terminating Mario Sr.'s rights as to all three children—Mario Jr., Esperanza, and Nery. Thus, the causes are remanded for further proceedings to this extent.

JUDGMENT IN NO. A-12-629 VACATED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.
JUDGMENT IN NO. A-12-662 AFFIRMED IN PART AND IN PART VACATED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.

RIEDMANN, Judge, concurring.

I concur with the result, but write separately because I do not agree that Ida should be required to revoke her relinquishment "within a reasonable time" without requiring the placement agency to sign the acceptance of revocation within a reasonable time as well. The majority would hold that 3 years is too long for Ida to file a revocation of relinquishment, but would allow DHHS to sign a valid acceptance of revocation 6 years after it was provided to it. In *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981), the Nebraska Supreme Court recognized that a signed relinquishment is not a mere formality, and it required strict compliance with the statute. The court specifically rejected the contention that to require strict compliance would place an undue burden on a licensed child placement agency or create uncertainty during the period between execution of a relinquishment and its acceptance. The court stated that "[a]rrangements for prompt and strict compliance with the statute can obviously be made by proper administrative procedures." *Id*. at 772,

305 N.W.2d at 877. To suggest that the State can sign an acceptance of revocation 6 years after it has been provided to it does not comport with "prompt and strict compliance with the statute."

If parents are required to revoke their relinquishments within a reasonable time, so, too, should the placement agency be required to accept the relinquishment within a reasonable time. Under the facts of this case, however, I agree that Ida is precluded from revoking her relinquishment at this late date. Although it does not appear from our record that Ida's relinquishment documents were filed with the court, copies of the documents are included in the record. On June 17, 2009, upon the representation of Ida's prior counsel that Ida had signed relinquishments and that DHHS had accepted the relinquishments, the court dismissed allegations against Mario Sr. and dismissed case No. JV06-470. Thereafter, DHHS, Ida, and the court acted for several years as though an acceptance existed. Under these facts, I concur that the policy reasons expressed by the majority require the result ultimately reached.