IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF TALLULAH J. & BREXEN K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TALLULAH J. & BREXEN K., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLANT,

V.

NICHOLAS J., APPELLEE.

Filed May 14, 2024.    Nos. A-23-631, A-23-632.

Appeals from the County Court of Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., for appellant.

Rhonda R. Flower, of The Law Office of Rhonda R. Flower, for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

MOORE, Judge.

INTRODUCTION

The guardian ad litem (GAL) for Tallulah J. and Brexen K. appeals from an order of the county court for Scotts Bluff County, sitting as a juvenile court, which denied the motions to terminate the parental rights of the children's father, Nicholas J. The GAL assigns that the juvenile court erred by vacating Nicholas' relinquishment of his parental rights and by finding that the termination of Nicholas' parental rights was not in the children's best interests. Under out de novo review of the record, we affirm the order of the juvenile court.

STATEMENT OF FACTS

*Procedural Background.*

Nicholas is the biological father of Tallulah, born in February 2017; and Brexen, born in May 2020. The parental rights of the children's biological mother were terminated by order of the juvenile court in May 2023, and we discuss her only as necessary to the resolution of the current appeal by Nicholas.

The Department of Health and Human Services (DHHS) became involved with the family in June 2021 when the mother's youngest child, a half-sibling of Tallulah and Brexen and unrelated to Nicholas, tested positive for methamphetamine and benzodiazepine at birth. DHHS began working with the mother as a voluntary case. However, due to continued concerns regarding the mother's mental health and inability to care for the children, separate petitions were filed on August 12, 2021, to adjudicate Tallulah and Brexen, respectively, pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on the father's use of controlled substances, the mother's use of controlled substances, the mother's inability to manage her mental health, and the children's lack of safe and stable housing. The petitions indicate that Nicholas was in jail at the time of filing. Motions for a custody and placement hearing were filed the same day, and the court granted the motions on August 18. Tallulah and Brexen have remained out of the home since they were removed from their mother's care.

A dispositional hearing was held on December 29, 2021. An order entered by the juvenile court the same day reflects that DHHS offered a case plan, which the court found was "not adopted as to [Nicholas] only." The court ordered DHHS to create a case plan specific to Nicholas.

A permanency hearing was held on July 27, 2022. An order entered by the juvenile court the same day reflects that additional DHHS case plans were received by the court; however, these case plans do not appear in our record on appeal. The court ordered that the permanency goal for Tallulah and Brexen be changed from reunification only, to reunification with a concurrent goal of adoption.

On December 20, 2022, the State filed separate motions for the termination of Nicholas' rights to Tallulah and Brexen respectively, alleging statutory grounds to terminate his rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016), and alleging that termination was in the children's best interests.

On April 4, 2023, Nicholas' attorney filed a "Notice of Relinquishment Hearing," which alleged that Nicholas relinquished his parental rights that same day and requested a relinquishment hearing on April 11, at the time previously scheduled for the termination of parental rights trial.

At the hearing on April 11, 2023, the juvenile court stated that it believed Nicholas was going to relinquish his parental rights that day. Nicholas' attorney stated that Nicholas had "already signed the documents," and the DHHS caseworker, Breanna Bird, stated that "[the documents] should be in the file. I had brought them over last week."

The juvenile court then addressed Nicholas and stated, "I have got these relinquishment papers that have been filed with the court, so I am just going to ask you a couple of quick questions." The following exchange occurred:

> Q: Did you go over these relinquishment questionnaires with someone from the
> department of health and human services?

A: Yes, sir.

Q: And . . .

A: Yes, sir, I did.

Q: And you signed your relinquishment for both Tallulah and Brexen; is that correct?

A: Yes, sir, it was.

Q: And . . .

A: They only offered me the two . . . options. It was termination or relinquishment. So . . .

Q: Yeah. Termination trial. That doesn't necessarily mean termination. That means trial. So . . .

A: Yeah . . . the word "trial" was never brought up, sir. . . it was termination or relinquishment, sir. And from what I . . . understood, relinquishment was better than just plain termination, sir, so I went with it. And then now at this point I heard that she was able to do an appeal, and so I am just not exactly sure why relinquishment and termination were the only things that were brought up to me, sir. . .

Q: So this is the situation that I am presented with now. If you don't want to relinquish today, I am surely not going to make you relinquish your kids today. I am not sure. Is the state going to be ready during this three-day process to do his termination also?

The State indicated that it was not ready to proceed with its motion to terminate Nicholas' parental rights. The court then stated to Nicholas, "since you have decided you don't want to relinquish today or at least you are not sure what you want to do, I am not going to accept your relinquishment." The court indicated that it would continue Nicholas' termination trial.

An order entered by the juvenile court on April 11, 2023, stated: "Father's portion of the TPR was continued. State was not prepared to go forward because the father was scheduled to relinquish."

*Termination Trial.*

Nicholas' termination trial was held on June 16, 2023. Nicholas, his mother, and Bird testified, and the following evidence was adduced.

Bird has been the family's caseworker since May 2022. She stated that at the time DHHS was able to make contact with Nicholas in August 2021, he was incarcerated at the Scotts Bluff County Jail. Tallulah and Brexen have been placed with Nicholas' mother and her husband during the entirety of the juvenile case.

Bird learned about Nicholas' involvement in the children's lives prior to the case being opened. The children primarily lived with their mother and her boyfriend after Brexen was born. Nicholas was a custodial parent for Tallulah during the first 3 years of her life but has never been a custodial parent for Brexen.

Nicholas testified that he actively parented Tallulah before he and the mother separated while she was pregnant with Brexen. He described providing Tallulah with clothing and food, taking her to and from daycare, as well as being Tallulah's primary caregiver when the mother was using drugs heavily. Nicholas also spent consistent time with both Tallulah and Brexen after he

and the mother separated, taking the children on outings four to five times per week. Nicholas admitted that he used drugs before he was incarcerated but denied ever using while the children were in the house with him.

Certified copies of three of Nicholas's criminal cases from the district court for Scotts Bluff County were entered into evidence. In September 2021, Nicholas pled to two amended informations, charging him with possession of a controlled substance (methamphetamine), no valid registration, and failure to appear; and operating a motor vehicle to avoid arrest and prohibited person in possession of a firearm, respectively. In November 2021 he was sentenced to concurrent terms of imprisonment, the longest sentence being a term of not less than 3 years, nor more than 3 years' imprisonment.

Nicholas' criminal actions in 2021 also caused his probation in a prior criminal case to be revoked. In August 2021 he was sentenced to concurrent terms of 270 days' incarceration for two prior counts of attempted distribution of a controlled substance (hashish), with the two sentences ordered to be consecutive to all prior sentences.

Following his sentencing in November 2021, Nicholas was moved to the Nebraska State Penitentiary in Lincoln, Nebraska. In March 2023, Nicholas moved to the Work Ethic Camp in McCook, Nebraska. Bird testified that, according to the Nebraska Department of Correctional Services (NDCS), Nicholas was eligible for parole in July 2024. Nicholas testified that he "has a mandatory number," and he will be fully released from NDCS in July 2024, rather than be eligible for parole.

Nicholas' case plan from October 2022 was entered into evidence. The case plan includes only one goal: Nicholas will continue to enroll in services while incarcerated in order to work toward a successful reunification with Tallulah and Brexen upon his release. Beneath the case plan goal are several strategies including that Nicholas will continue to enroll in programs provided by NDCS, particularly those focused on substance abuse and parenting curriculums; participate in residential substance use programming provided by NDCS; participate in any evaluations ordered by the juvenile court and/or sign releases for DHHS to obtain copies of any evaluations already completed; follow the NDCS services treatment plan as directed by his caseworker; and participate in phone calls with Tallulah and Brexen at least once a week. Nicholas' case plan goal and strategies have remained consistent throughout the case.

Bird wrote Nicholas a letter with her contact information shortly after being assigned his family's case. Additionally, a DHHS courtesy worker attempted monthly contact with Nicholas beginning in September 2021, but was unable to meet with Nicholas until May 2022 due to NDCS policies and COVID-19 pandemic protocols. Bird described the monthly courtesy meetings after May 2022 as "very consistent. They happened once a month with Nick."

In the June 2022 meeting with the courtesy worker, Nicholas reported that he had asked to have Bird added to his contact list at the penitentiary and had been told that it would take approximately 90 days for Bird to be added.

At the July 2022 meeting, the courtesy worker updated Nicholas on the progression of the juvenile case, as the permanency hearing was coming up and DHHS was recommending that adoption be added as a secondary permanency goal. The courtesy worker explained DHHS' expectations in order to avoid filing a motion for termination of parental rights and Bird testified that Nicholas, "indicated that he would be willing to relinquish if his parents would be adopting."

Bird wrote Nicholas another letter in September 2022 and enclosed a back-to-school interview she had conducted with Tallulah, who was soon to begin kindergarten. In October 2022, Nicholas informed the courtesy worker that Bird had still not been added to his contact list by the penitentiary.

At the December 2022 meeting, the courtesy worker again discussed the potential filing of a motion for termination of parental rights with Nicholas. Bird stated that, "15 out of 22 was discussed, termination versus relinquishment." Nicholas told the courtesy worker that he was "determined to get his kids back once he had been released from prison."

Bird set up a Zoom call between herself, Nicholas, and Nicholas' attorney on March 27, 2023, to discuss Nicholas' potential relinquishment. Bird stated that she gave Nicholas the opportunity to participate in relinquishment counseling but did not indicate whether Nicholas accepted or declined the counseling. During the Zoom call, Bird discussed the upcoming termination trial. Nicholas' primary concern was whether Tallulah and Brexen would be moved from his mother's home and whether his mother would be able to adopt the children. Bird explained that while she could not guarantee any particular outcome, there was no intention by DHHS to move the children. Bird noted that DHHS' inability to make promises regarding placement is a "specific question on the questionnaire."

At the end of the Zoom call, Nicholas stated that he wanted to proceed with relinquishment. Bird completed the paperwork and sent it on to another DHHS permanency worker who made arrangements to finalize the paperwork with Nicholas' unit manager at the Work Ethic Camp.

Bird testified that on April 4, 2023, the permanency worker met with Nicholas along with a notary and a witness, and that Bird and Nicholas' attorney joined via conference call. The permanency worker explained the relinquishment paperwork to Nicholas and Bird and Nicholas' attorney were present to answer any additional questions Nicholas may have. There was no testimony establishing that Nicholas actually signed the relinquishment documents at this time.

The next contact Bird had with Nicholas was at the April 11, 2023, hearing the following week. The intention was to have Nicholas verify on the record that he had signed the paperwork for relinquishment. However, at the beginning of the hearing, Nicholas stated that he no longer wished to relinquish.

Bird arranged another Zoom call between herself, Nicholas, and his attorney, to discuss why Nicholas had changed his position regarding relinquishment. Nicholas stated that he would rather proceed to a termination trial as he "wanted to be able to parent his kids."

Nicholas did not provide any testimony regarding his execution of the relinquishment forms or his statements to the juvenile court during the April 11, 2023, hearing.

In a meeting with a courtesy worker in May 2023, Nicholas spoke about an open adoption and indicated his preference for a guardianship for his children as opposed to them being adopted. During a video call with Bird in June 2023, Nicholas asked Bird why DHHS would not pursue a guardianship, given that he would be released from NDCS in 8 months. Bird responded that DHHS did not support guardianship for children as young as Tallulah and Brexen.

Regarding Nicholas' progress with his case plan, he testified that he has participated in every program that was available to him during his incarceration. He completed "RSU-90" (a 90-day residential substance use program), during which he participated in Narcotics Anonymous and Alcoholics Anonymous, learned about relapse prevention, and worked with a counselor.

Nicholas also learned about his addiction through the program "Success Keys and Changes." Nicholas completed "Destination Dads- Inside Out Dad," a parenting class specifically for incarcerated fathers. The parenting class helped Nicholas learn how to have more meaningful and age-appropriate conversations with his children regarding his incarceration and its effect on them. Nicholas also completed "Victim Impact," which emphasized the importance of Nicholas accepting the crimes he had committed and offering an apology not only to his family, but to the larger community and the law enforcement officers who were involved. Nicholas stated that he wanted to take as many classes as possible so that when he was released, "I was a better person in that community of Scottsbluff."

Nicholas had also completed "Iron Bars," "Moral Reconation Therapy," "Thinking for Change," and the "Restorative Justice Intervention," all programs focused on enhanced moral reasoning and decision making, as well as an animal rehabilitation program for aggressive and reactive dogs. At the time of trial, he was in the process of completing "7 Habits on the Inside" and "Getting it Right." Both programs focused on strategies to assist participants with reentry. Nicholas was on the waitlist for "Beyond Anger."

Bird was unaware that Nicholas had completed Success Keys and Changes, Victim Impact, Restorative Justice, or Destination Dads, though Nicholas' completion of other programs had been reported by the courtesy worker. Bird was also unaware that Nicholas had worked with a counselor as part of RSU-90.

Nicholas testified that he had certificates for all of the programs he had completed, but that no one from DHHS had ever asked him for the certificates. Likewise, no one from DHHS had asked Nicholas to sign a release with regards to the evaluation he received when he entered NDCS.

Nicholas also testified regarding his addiction. Nicholas' 2-year incarceration at the time of trial was the longest period of time that he had been fully sober, as he first began using methamphetamine at age 13. Throughout his life Nicholas had attempted several periods of sobriety but was never able to sustain sobriety longer than 70 days.

Nicholas had developed a reentry plan for his release and anticipated going back to work for his father as a commercial painter. Nicholas also planned to move in with his father and would later look for an apartment when he felt confident in sustaining his sobriety on his own. He noted that he would have access to a vehicle as well. Nicholas described his support system as including his parents, his extended family, his coworkers, and the individuals at the local community college. Nicholas looked forward to breaking old patterns and creating new "people, places, and things," which were free of the baggage of his addiction. Nicholas' ultimate goal upon his release is to be in the position to have placement of Tallulah and Brexen. Nicholas' mother testified consistently regarding Nicholas' reentry plan.

Both Nicholas and Bird testified that Nicholas calls the children every night. Nicholas also calls the children multiple times a day on the weekends. Nicholas testified that the children know him as their father and that they have "a bond that I would never let go." Nicholas' mother testified that the children are always excited to speak to their father and that the phone calls typically last 5 minutes. Nicholas' mother has been able to observe a bond between Nicholas and the children and that Nicholas is engaged and interested in their lives.

Nicholas has not seen the children since he was incarcerated in the summer of 2021. At the time of trial, Nicholas anticipated soon being able to participate in face to face visits with the

children at the Work Ethic Camp and spending weekends with the children by December 2023 through NDCS' work release program.

Bird testified that Tallulah was doing well physically and was in therapy to help her process the termination of her mother's parental rights and the inconsistent visitation with her mother, which had been an issue throughout the case. Tallulah fills out a questionnaire with Bird roughly every other month. One of the questions asks the child to list the top three important people in her life and she has put Nicholas on the list on occasion. Brexen was also doing well and concerns regarding his speech development had been resolved by the time of trial.

Bird testified that DHHS was recommending that Nicholas' parental rights be terminated due to the amount of time the children had been in out of home care and because the children had already built a secure attachment to Nicholas' mother and her husband. Bird was also concerned that Nicholas' addiction would be triggered by returning to Scottsbluff after he was released from NDCS.

Bird acknowledged that Nicholas had completed every strategy in his case plan despite being incarcerated. However, though Nicholas had availed himself of many classes, he had not done any actual parenting since he was incarcerated, and DHHS was concerned about his ability to meet the needs of two small children while being a single parent and managing other stressors, including his history of substance use.

*Juvenile Court's Order.*

On August 2, 2023, the juvenile court entered an order denying the motions to terminate Nicholas' parental rights to Tallulah and Brexen. The juvenile court found that though the State had proved by clear and convincing evidence that pursuant to § 43-292(7), Tallulah and Brexen had been in out-of-home placement for 15 or more months out of the most recent 22 months, it was not in the children's best interests to terminate Nicholas's parental rights. The court noted that Nicholas had completed his case plan and had "gained a great deal of insight to his addiction, causation, and future life free of drugs." The court found that Nicholas had maintained consistent contact with the children and shared a positive bond, and that Nicholas' "attitude and conduct should be applauded."

However, the juvenile court also stated that it was concerned about Nicholas' addiction and observed that aside from Nicholas' forced sobriety due to incarceration, Nicholas has not had long-term sobriety since he was a teenager. The court found that once Nicholas was released from incarceration, "it would be a lengthy process for this court to find that [Nicholas] could provide a safe and stable home for the children." To address the court's concerns, it scheduled a permanency and review hearing for April 16.

The GAL appeals.

## ASSIGNMENTS OF ERROR

The GAL assigns that the juvenile court erred by (1) vacating Nicholas' voluntary relinquishment of his parental rights because Nicholas failed to follow the four requirements for a valid revocation; and (2) finding that the termination of Nicholas' parental rights to Tallulah and Brexen was not in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

ANALYSIS

*Nicholas' Relinquishment.*

The GAL first assigns that the juvenile court erred in vacating Nicholas' voluntary relinquishment of his parental rights to Tallulah and Brexen, because Nicholas failed to follow the four requirements for a valid revocation.

Pursuant to Neb. Rev. Stat. § 43-106.01 (Reissue 2016), when a child shall have been relinquished by written instrument, as provided by Neb. Rev. Stat. §§ 43-104 and 43-106 (Reissue 2016), to the Department of Health and Human Services or to a licensed child placement agency and the agency has, in writing, accepted full responsibility for the child, the person so relinquishing shall be relieved of all parental duties toward and all responsibilities for such child and have no rights over such child. See *In re Interest of Zoey S.*, 22 Neb. App. 371, 853 N.W.2d 225 (2014).

Nebraska appellate courts have held that there are four requirements for a valid and effective revocation of a relinquishment of parental rights: (1) There must be a duly executed revocation of a relinquishment, (2) the revocation must be delivered to the licensed child placement agency or the Department of Health and Human Services, (3) delivery of the revocation must be within a reasonable time after execution of the relinquishment, and (4) delivery of the revocation must occur before the agency has, in writing, accepted full responsibility for the child. *Id*. See, also, *Kellie v. Lutheran Family & Social Service*, 208 Neb. 767, 305 N.W.2d 874 (1981); *In re Interest of Nery V. et al.*, 20 Neb. App. 798, 832 N.W.2d 909 (2013).

Nicholas' signed relinquishments are not a part of the record before us. The GAL concedes that "[n]either [Nicholas'] relinquishments, nor NDHHS's acceptances thereof, were filed with the clerk nor marked and offered as evidence." Brief for appellant at 23. However, other evidence in the record indicates that Nicholas executed relinquishment forms regarding both his children. His attorney filed a notice of relinquishment hearing which stated that Nicholas relinquished his parental rights as of April 4, 2023, and Nicholas affirmed to the juvenile court at a hearing on April 11 that he reviewed relinquishment questionnaires with DHHS personnel and signed relinquishments. However, at the hearing on April 11 hearing, Nicholas also expressed confusion regarding his options to relinquishment, including his right to appeal.

The GAL argues that a change of attitude subsequent to signing a relinquishment of parental rights is insufficient to invalidate it. See *In re Interest of Zoey S., supra*. In the absence of threats, coercion, fraud, or duress, a properly executed relinquishment of parental rights signed by a natural parent knowingly, intelligently, and voluntarily is valid. *Id*. However, without Nicholas' executed relinquishments before us, we are unable to determine whether his relinquishments are valid. Further, the juvenile court did not "vacate" the purported relinquishments at the April 11 hearing, as argued by the GAL, but following Nicholas' testimony, the court indicated that it was

"not going to make [Nicholas] relinquish his kids today" and it did not "accept [his] relinquishment."

The GAL contends that Nicholas' admissions at the April 11 hearing are sufficient evidence of his relinquishment of his parental rights to Tallulah and Brexen. The GAL cites to *In re Interest of Nery V. et al.*, 20 Neb. App. 798, 832 N.W.2d 909, (2013), where this court considered an attempted revocation by a mother 3 years after she executed relinquishments to her children. In *In re Interest of Nery V.*, the mother's signed relinquishments were not filed with the juvenile court but were included in our record on appeal. Id. at 804, 832 N.W.2d 914.

We do not find *In re Interest of Nery V.* to be applicable in this case because here, Nicholas' relinquishments were neither filed with the juvenile court nor included in our record on appeal. It is incumbent upon the appellant to present a record supporting the errors assigned; absent such a record, an appellate court will affirm the lower court's decision regarding those errors. *In re Guardianship of Suzette G.*, 27 Neb. App. 477, 934 N.W.2d 195 (2019), affirmed, 305 Neb. 428, 940 N.W.2d 829 (2020).

Given the absence of any duly executed relinquishments in the record, and based upon our review of the record, we find no error in the juvenile court's actions in connection with the purported relinquishments. We proceed to review the juvenile court's denial of the State's motions for termination of Nicholas' parental rights.

*Statutory Grounds for Termination.*

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(7). The GAL does not challenge the court's findings with respect to statutory grounds, but we address the issue briefly for the sake of completeness.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id.*

Here, Tallulah and Brexen have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from their mother's care on August 18, 2021, at which time Nicholas was in jail. The State filed its motion to terminate Nicholas' parental rights on December 20, 2022, and the termination trial was held in June 2023. The children have remained out of the home since their removal in August 2021. At the time of trial, the children had been out of the home for nearly 22 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that Tallulah and Brexen had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Nicholas' parental rights exists.

*Best Interests and Unfitness.*

The GAL assigns that the juvenile court erred in finding that it was not in the children's best interests to terminate Nicholas' parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id*.

Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And we have noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Thus, in a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id*. We recognize and consider that it was Nicholas' own actions that caused him to be incarcerated. We also consider that despite Nicholas' incarceration, he has been an active participant in the juvenile case.

The testimony at trial was consistent that Nicholas has completed his goal and every strategy in his case plan. He has engaged in every program available to him during his incarceration and has stayed in communication with DHHS. Nicholas calls Tallulah and Brexen every day, meaningfully engages with the children, and is interested in their wellbeing. Nicholas' mother has been able to observe a bond between Nicholas and the children and reported that the children look forward to his phone calls and enjoy speaking with their father. Tallulah has listed Nicholas as one of the most important people in her life. Though Nicholas had not seen the children for 2 years at the time of trial, with his move to the Work Ethic Camp, he anticipated being able to see the children for in-person visits. Nicholas also expected to be participating in NDCS' work release program by December 2023 and would then have the opportunity to have weekend visits with the children. Nicholas was expected to be released from NDCS, either fully or on probation, by July 2024.

The GAL argues that Nicholas was not a fit parent by the time he was incarcerated in the summer of 2021. She points to Nicholas' drug use at an early age and his inability to sustain long-term sobriety prior to his incarceration as evidence of his unfitness.

Nicholas testified that as of the termination trial, he has been sober for 2 years and had completed RSU-90, a 90-day residential substance use program, during which he participated in Narcotics Anonymous and Alcoholics Anonymous, learned about relapse prevention, and worked with a counselor. Nicholas has secured employment, housing, and transportation upon his release and described a large support system of family members and friends. Though Nicholas testified

that he has historically been unable to maintain sobriety for longer than 70 days, he also stated that he never used drugs in the presence of the children and was able to step into the role of the primary caregiver when the children's mother was not able to. As the juvenile court noted in its order, Nicholas' testimony expressed insight into his addiction, causation, and his future drug-free life.

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). We recognize, as the juvenile court did, that it will take time for Nicholas to establish himself following his release from NDCS. We are sensitive to the fact that the children have been in the care of DHHS for a large part of their lives. However, given the relationship between Nicholas and the children, his expressed desire to parent his children, and Nicholas' success in following his case plan, the State was unable to prove by clear and convincing evidence that Nicholas is an unfit parent. Nicholas has demonstrated both an ability and willingness to rehabilitate himself. Based upon these circumstances, we conclude that Nicholas should be given an opportunity to make progress on a reunification plan.

Based upon our de novo review, we find no error by the juvenile court in its determination that termination of Nicholas' parental rights to Tallulah and Brexen was not in their best interests. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016) (termination of parental rights is final and complete severance of child from parent and removes entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort).

CONCLUSION

The juvenile court did not err in its determinations regarding Nicholas' purported relinquishment of his parental rights. The juvenile court also did not err in finding that the State failed to prove by clear and convincing evidence that termination of Nicholas' parental rights is in the best interests of Tallulah and Brexen. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.